UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:                                              :
                                                    :
            QUIGLEY COMPANY, INC.                   :        Chapter 11
                                                    :        Case No. 04-15739(SMB)
                                 Debtor.            :
-------------------------------------------------------------X
CONTINENTAL CASUALTY COMPANY,                       :
et al.,                                             :
                                                    :
                                 Plaintiffs,        :        Adv. Proc. No. 06-1299
                                                    :
                 -- against --                      :
                                                    :
PFIZER, INC., et al.,                               :
                                                    :
                                 Defendants.        :
-------------------------------------------------------------X

## OPINION REGARDING MOTIONS TO DISMISS, TO STAY, FOR RELIEF FROM THE STAY AND OTHER RELIEF

**A P P E A R A N C E S :**

DICKSTEIN, SHAPIRO, MORIN & OSHINSKY LLP
Attorneys for Defendant Pfizer, Inc.
1177 Avenue of the Americas
New York, New York 10036

            Sanford N. Berland, Esq.
                 Of Counsel

GILBERT HEINTZ & RANDOLPH LLP
Attorneys for Defendant Pfizer, Inc.
1100 New York Avenue, NW, Suite 700
Washington, D.C. 20005

            David B. Killalea, Esq.
            Jonathan M. Cohen, Esq.
                 Of Counsel

SCHULTE ROTH & ZABEL LLP
Attorneys for Defendant Quigley Company, Inc.
919 Third Avenue
New York, New York 10022

      Michael L. Cook, Esq.
      Lawrence V. Gelber, Esq.
          Of Counsel


SEYFARTH SHAW LLP
Attorneys for Plaintiffs Continental Casualty
  Company and Continental Insurance Company
1270 Avenue of the Americas, Suite 2500
New York, New York 10020

      David C. Christian II, Esq.
      Robert M. Dremluk, Esq.
      Andrew T. Hahn, Sr., Esq.
          Of Counsel


CARROLL, BURDICK & McDONOUGH LLP
Attorneys for Plaintiffs Continental Casualty
  Company and Continental Insurance Company
44 Montgomery Street, Suite 400
San Francisco, California 94104

      Rodney L. Eshelman, Esq.
      Gretchen A. Ramos, Esq.
      Shay A. Gilmore, Esq.
          Of Counsel


STEPTOE & JOHNSON LLP
Attorneys for Defendant Travelers Casualty
  & Surety Company
750 Seventh Avenue, 19th Floor
New York, New York 10019

      John D. Lovi, Esq.
      James E. Rocap, Esq.
      George R. Calhoun, Esq.
      Justin F. Capuano, Esq.
          Of Counsel

HOGAN & HARTSON LLP
Attorneys for Defendants First State Insurance Company,
   Hartford Accident and Indemnity Company,
   New England Insurance Company, and
   Twin City Fire Insurance Company
875 Third Avenue
New York, New York 10022

      William J. Bowman, Esq.
      Joshua D. Weinberg, Esq.
      David M. Posner, Esq.
         Of Counsel


**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

Plaintiffs Continental Casualty Company ("CCC") and Continental Insurance Company ("CIC," and together with CCC, the "Plaintiffs") commenced this adversary proceeding against Pfizer, Inc. ("Pfizer"), Quigley Company, Inc. ("Quigley") — the debtor in possession and Pfizer's wholly owned subsidiary — and sixty-four other insurance companies that issued policies to Pfizer.  In the main, the Plaintiffs seek a declaratory judgment that certain policies issued to Pfizer by CIC, or CIC's predecessor-in-interest, London Guarantee & Accident Company of New York ("LG&A"), exclude coverage for asbestos-related claims.  Alternatively, the Plaintiffs seek to reform the CIC Policies to exclude such coverage, or if coverage exists, to apportion liability among the Plaintiffs and the various defendant insurance companies.[1]  In a separate count, Count Four, the Plaintiffs seek a declaration that Pfizer and Quigley anticipatorily repudiated the CCC and CIC policies.  Guildhall Insurance Company filed a cross-

---

[1]    The Complaint refers to CIC and CCC collectively as the "Plaintiffs," but CCC's rights are not implicated in the declaratory judgment and reformation counts.  Its rights may be implicated in the apportionment claim, but this is not spelled out in the pleadings or the various motions.  This opinion follows the convention used in the Complaint, and frequently refers to the "Plaintiffs" without distinguishing between CIC and CCC.

claim seeking the same declaratory relief that the Plaintiffs requested in Counts One (coverage) and Two (reformation).

Pfizer and Quigley moved to dismiss the entire Complaint (and Guildhall's cross-claim) for lack of subject matter jurisdiction, and the anticipatory repudiation claim for the additional reason that it fails to state a claim. In addition, a group of defendant insurance companies (the "Certain Insurers") moved to stay the adversary proceeding and lift the automatic stay to allow arbitration of the coverage issues raised in the Complaint. Finally, four of the Certain Insurers (collectively "Hartford") moved for dismissal or abstention or a stay on the same ground.

For the reasons that follow, Counts One, Two and Three are stayed pending the completion of arbitration, and the Certain Insurers are granted relief from the automatic stay to commence arbitration. Hartford's motion to dismiss or abstain is denied, but the motion for a stay is granted. Finally, Count Four is dismissed without prejudice to the right of any party in interest to raise the same issues as an objection to confirmation.

## BACKGROUND

### A.    Introduction

Quigley was founded in 1916 as a refractory company, and engaged in the development manufacture and sale of refractory products for the iron, steel, power generation, petroleum, chemical and glass industries. (Fourth Amended Disclosure Statement with respect to Quigley Company, Inc. Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated October 17, 2005 (the "Disclosure Statement"), § IV.A.1 at 30.)[2] Beginning in the

---

[2]        The Fourth Amended Disclosure Statement With Respect to Quigley Company, Inc. Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated October 17, 2005 (the "Disclosure Statement")

1940's and until the early 1970's, Quigley made or sold a number of products containing asbestos.  (Id. § IV.A.2 at 30.)

On August 25, 1968, Pfizer acquired Quigley's stock.  (Id. § IV.A.1 at 30)  In 1992, Quigley sold substantially all of its assets to a third-party, and retained the liabilities stemming from products sold prior to the sale of its business.  (Id. § IV.A.3 at 30.)  Since then, Quigley's principal business has been the management of personal injury claims brought against it by persons allegedly exposed to asbestos-containing products formerly made, used or sold by Quigley.  (Id. § IV.A.4 (a) at 31.)

In the course of its business, Pfizer purchased comprehensive general liability insurance policies to cover the cost of defending and resolving personal injury claims for itself and its subsidiaries.  Pfizer's policies covered Quigley after Pfizer acquired Quigley's stock.  (Id. § IV.A.5 (a) at 31-32.)  CCC issued four policies to Pfizer between 1964 and 1975 (the "CCC Policies"), which were the subject of a settlement agreement, effective March 15, 1999 (the "1999 Settlement"), among Pfizer, Quigley and CCC.  (¶ 80.) [3]  The CCC Policies' limits have been paid or are being paid pursuant to the terms of the 1999 Settlement.  (Id.)  The Plaintiffs do not contend that there is a coverage dispute regarding the CCC Policies.

---

and the Quigley Company, Inc. Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated Oct. 6, 2005 (the "Plan") are attached to ECF Doc. #629 in Case no. 04-15739.  The electronic document exceeds 650 pages. All references in this opinion to a page in the Disclosure Statement, the Plan or any exhibits attached to either, refer to the page number of the electronic document.

[3]     Unless otherwise stated, the citation "(¶ __)" refers to the paragraphs in the Plaintiffs' Complaint, dated February 21, 2006. (ECF Doc. # 1.)

CIC and LG&A[4] issued liability insurance policies to Pfizer during the period of October 1, 1982 to October 1, 1984 (the "CIC Policies"). These policies also cover Quigley. (¶ 1.) The CIC Policies "follow form" to certain policies issued by Transit Casualty Company to Pfizer for the same period (the "Transit Policies"), and "exclude coverage for 'claims . . . arising out of asbestosis or any similar condition caused by asbestos.'" (¶¶ 1, 78-79, 83.) Pfizer was aware of the exclusion when it purchased the CIC Policies, (¶ 86), but Pfizer and Quigley now contend that the CIC Policies cover asbestos-related claims. (¶ 87.)

In addition, the defendant insurance companies issued one or more liability insurance policies that, Pfizer claims, may provide coverage for asbestos-related claims. (¶ 84.) Like the CIC Policies, some of the defendants' policies exclude coverage for asbestos claims by their terms, or "follow form" to the Transit Policies and incorporate the asbestos exclusion. (See e.g. Memorandum in Support of Motion by Certain Insurers to Stay Adversary Proceeding, dated April 21, 2006, ("Certain Insurers' Memorandum") at 7, n.11)(ECF Doc. # 114.)

## B.    The Reorganization Plan

Quigley filed a voluntary chapter 11 petition on September 3, 2004, to resolve its liability for asbestos-related personal injury claims, (Disclosure Statement § V.A at 46), and filed its proposed plan on October 6, 2005. (See Plan at 132-200.) Under the Plan, Quigley's asbestos-related liabilities, as well as Pfizer's liabilities that are based on Quigley's conduct or products, will be channeled to a trust fund (the "Asbestos PI Trust"). (Disclosure Statement § I.A at 16; Plan §§ 1.1 at 142 (defining "Asbestos PI Trust"); 9.3 at 170-72.) The channeled claims can

---

[4]    CIC is the successor to LG&A under one policy issued by LG&A to Pfizer. (¶ 4.) LG&A is not a party to this adversary proceeding.

only be pursued through, and paid from, the Asbestos PI Trust; they cannot be asserted against

reorganized Quigley or Pfizer.  (Disclosure Statement § I.A at 146.)

Pfizer and Quigley will transfer certain assets to fund the Asbestos PI Trust.  Importantly,

the "Quigley Contribution" will include Quigley's rights to the proceeds under various insurance

policies and settlement agreements  (i.e., the "At-Issue Policies").[5]  (See Plan § 9.3(d) at 152-

153).)  The At-Issue Policies are identified in Exhibit C to the Plan, which lists the "Shared

Asbestos Insurance Policies."  (See id. at 343-350.)  According to § 1.1 of the Plan, these

policies cover "all or certain Asbestos PI Claims."  (Id. at 155.)  Quigley is contributing its rights

under these policies to the Asbestos PI Trust.  Pfizer will also relinquish its rights and interests in

the At-Issue Policies.[6]

Two other Plan exhibits bear mention.  Exhibit D, (see id. at 351-353), consists of the

"Shared Asbestos-Excluded Insurance Policies," and as the title suggests, these policies "provide

coverage to Pfizer and Quigley for claims other than claims alleging exposure to asbestos and/or

asbestos-containing products."  (Id. at 155.)   Similarly, Exhibit E consists of the "Shared

Asbestos-Excluded Claims-Made Insurance Policies," (id. at 354-56), and these policies also

---

[5]       The "Quigley Contribution" includes the consideration to be delivered to the Asbestos PI Trust, on account
of Asbestos PI Claims, consisting of, among other things, the "Quigley Insurance Transfer."  (See Plan at 152-153.)
The "Quigley Insurance Transfer" includes "the transfer, grant, and assignment by Quigley of the Quigley
Transferred Insurance Rights to the Asbestos PI Trust as part of the Quigley Contribution."  (Id. at 153)  The
"Quigley Transferred Insurance Rights" consist, in turn, of "any and all rights, title and interest Quigley has in and
to the . . . the Shared Asbestos Insurance Policies," as listed on Exhibit C of the Plan.  (Id.)  The "Shared Asbestos
Insurance Policies" are "the occurrence-based policies issued to Pfizer which provide coverage to Pfizer and
Quigley for, among other things, all or certain Asbestos PI Claims, as listed on Exhibit C to the Plan."  (Id. at 155.)

[6]       The Plan provides that on or after the effective date, Pfizer will execute the "Insurance Relinquishment
Agreement."  (See Plan § 1.1 (defining "Pfizer Contribution") at 150-151; and § 9.3(e) (providing for execution of
"Insurance Relinquishment Agreement.") at 171.)   Under the "Insurance Relinquishment Agreement," attached as
Exhibit K to the Plan, Pfizer will relinquish its rights, with certain exceptions, in the Shared Asbestos Insurance
Policies.  (Plan at 447, 453-465.)

7

"provided coverage to Pfizer and Quigley for certain claims other than claims alleging exposure to asbestos and/or asbestos-containing products."  (Id. at 155.)  Quigley is not contributing its rights under these policies to the Asbestos PI Trust.  (See id. at 153 (defining "Quigley Transferred Insurance Rights").)  Similarly, Pfizer is not relinquishing its rights under these policies.  (Id. at 448.)

The CCC and CIC Policies are listed in Exhibit C to the Plan.  In addition, Exhibit C lists the policies of most of the remaining insurer defendants.  Accordingly, Quigley's rights under these policies will form part of the Pfizer and Quigley contributions to the Asbestos PI Trust. (Plan Ex. C at 343-350; see Complaint ¶¶ 84, 87.)

The Plan has not been confirmed, and no confirmation hearing has been scheduled.

## C.    The Wellington Agreement

The arbitration issues raised by the parties implicate the Wellington Agreement,[7] entered into on June 19, 1985, by Pfizer, Quigley, CIC (but not CCC) and scores of other insurers and asbestos defendants.  The Wellington Agreement was designed to address the widespread litigation of asbestos-related claims, insurance coverage disputes, and the application of differing rules of law and court decisions existing throughout the United States during the period leading up to its execution.  (See Wellington Agreement §I, ¶2.)   It provided, inter alia, a method "for the administration, payment and disposition of asbestos-related claims," among the subscribing insurers and producers.  (Id.)

---

[7]    The Wellington Agreement, also known as the "Agreement Concerning Asbestos-Related Claims," is attached as Exhibit A to the Declaration of James E. Rocap, III in Support of Motion by Certain Insurers to Stay Adversary Proceeding, dated Apr. 21, 2006, (the "Rocap Declaration"), which is filed as part of ECF Doc. # 114).

8

Two provisions of the Wellington Agreement bear directly on the arbitration issues.  The signatories agreed that they "shall resolve through [ADR under Appendix C] any disputed issues within the scope of the Agreement and the Appendices hereto."  (Wellington Agreement § VIII, ¶ 6.)   Appendix B set out the defenses and exclusions reserved by the subscribing insurers, and stated that  "disputes concerning such matters shall be resolved pursuant to" the ADR procedures.  One such retained defense was that "coverage under an insurance policy is not available due to express exclusions for claims involving . . . particular products or particular diseases."  (Id., App. B, ¶ 8.)  At first blush, it appears that the Plaintiffs are required to arbitrate the coverage dispute with Pfizer, Quigley and the other insurers who signed the Wellington Agreement (collectively, the "Wellington Signatories").

CIC contends, however, that the agreement to arbitrate did not extend to the policies at issue in this lawsuit because the CIC Policies (as well as the At-Issue Policies issued by the other Wellington Signatories) are not listed in Appendix D. [8]  (See Affidavit of Gretchen A. Ramos in Support of Continental's Opposition to: (1) Hartford's Motion to Dismiss or, in the Alternative, Abstain or Stay the Adversary Proceeding; and (2) Motion by Certain Insures to Stay the Adversary Proceeding, sworn to May 19, 2006, at Ex. B.) (ECF. Doc. # 186, Part 3.)  The Wellington Agreement directed the parties to schedule "[a]ll policies of insurance affording general liability, products liability or premises coverage."  (Wellington Agreement, App. D.)  The initial "coverage block" consisted "of all insurance policies issued to such Subscribing Producer by its Subscribing Insurers to become effective prior to the date (within the period January 1, 1973 through December 31, 1979) selected by the Producer and set forth in its

---

[8]      At oral argument, Pfizer and Quigley stated that they intended to add the CIC Policies and the other At - Issue Policies to Schedule D.  (See Transcript of Hearing held on June 14, 2006 ("Tr."), at 113)(ECF Doc. # 258).)

Schedules of Insurance." (Wellington Agreement § IX, ¶ 1.) The parties could add later policies

that became effective prior to June 19, 1985. (Id.) According to the certification at the end

Appendix D, "[t]he foregoing comprises the Schedules of all relevant policies of insurance

known to the Subscribing Producer and to any of its Subscribing Insurers as of this of this date,"

and any insurance policies that subsequently become relevant should be added. (Wellington

Agreement App. D.)

The Plaintiffs maintain that the Wellington Agreement arbitration clause only applied to

scheduled policies.

### D.    The Complaint

The Complaint consists of four counts; the first three concern the coverage issue. Count

One seeks a declaratory judgment that the CIC Policies do not cover asbestos-related claims. (¶

106.) Count Two alleges that if the exclusions incorporated by reference in the CIC Policies do

not extend to asbestos-related claims, the failure is the product of a mutual mistake by Pfizer,

CIC and LG&A, or the unilateral mistake of CIC and LG&A. (¶ 95.) Accordingly, the CIC

Policies should be reformed to exclude "any claim alleging exposure to asbestos, the contracting

of asbestos-related disease or injury, or any liability resulting therefrom." (¶ 106.) Count Three

asserts that if the CIC Policies cover asbestos-related claims, the coverage liability for the

applicable policy periods should be apportioned among the Plaintiffs and the various defendant

insurance companies. (Id.)

Count Four challenges the Plan's proposed assignment of rights in the CIC and CCC

Policies to the Asbestos PI Trust. (See ¶ 88.) Through the Plan, Pfizer and Quigley have

indicated their intention to transfer the CIC and CCC Policies in breach of the policies' anti-assignment clauses and otherwise improperly affect the Plaintiffs' rights under the policies without their consent.  (See ¶¶ 89, 100.)  The Plaintiffs seek (1) a declaration that Pfizer and Quigley have repudiated the CIC and CCC Policies and are estopped from enforcing the terms of the policies, (2) a declaration that the Plaintiffs have no further obligation under the policies, and (3) an award of money damages.  (¶ 106.)

As noted, the Complaint named 64 insurers, but only 40 defendant insurers remain.  The remaining insurers, including CIC and CCC (and hence, 42 parties), break down into three categories.  Group 1 includes those eight insurers who issued policies listed in Exhibit C to the Plan (i.e., At-Issue Policies), and also signed the Wellington Agreement:

### Group 1 Insurers

| | |
|---|---|
| 1 | Continental Insurance Company |
| 2 | Employers Insurance Company Of Wausau |
| 3 | New England Insurance Company |
| 4 | Twin City Fire Insurance Company |
| 5 | International Insurance Company |
| 6 | Royal Indemnity Company |
| 7 | Travelers Casualty & Surety Company |
| 8 | Westchester Fire Insurance Company |

Group 2 includes 25 insurers that issued At-Issue Policies that appear on Exhibit C, but did not sign the Wellington Agreement:

### Group 2 Insurers

| | |
|---|---|
| 1 | Affiliated FM Insurance Company |
| 2 | Caisse Industrielle D'assurances Mutuelle |
| 3 | Korean Reinsurance Company |
| 4 | Lilloise D'assurances |
| 5 | Mutuelle Unies |
| 6 | La Preservatrice Fonciere Tiard |

| 7 | Le Secours |
|---|---|
| 8 | Union Des Assurances de Paris |
| 9 | Assurances Generales de France Iart |
| 10 | Allianz Global Risks U.S. Insurance Company |
| 11 | Allianz Underwriters Insurance Company |
| 12 | Allstate Insurance Company |
| 13 | Atlanta International Insurance Company |
| 14 | Continental Casualty Company[9] |
| 15 | Florists' Mutual Insurance Company |
| 16 | Government Employees Insurance Company |
| 17 | Motor Vehicle Casualty Company |
| 18 | Guildhall Insurance Company Ltd. |
| 19 | National Casualty Company |
| 20 | Old Republic Insurance Company |
| 21 | Westport Insurance Company |
| 22 | One Beacon America Insurance Company |
| 23 | TIG Insurance Company |
| 24 | Colonia Versicherung A.G. |
| 25 | Haftpflichtverband Der Deutschen Industrie V.A.G. |

The final Group, Group 3, consists of those nine insurers who did not issue policies

included on Exhibit C: [10]

### Group 3 Insurers

| 1 | American Centennial Insurance Company |
|---|---|
| 2 | British Northwestern Insurance Company Ltd. |
| 3 | Dairyland Insurance Company |
| 4 | Excess Insurance Company Ltd. |
| 5 | Federal Insurance Company |

---

[9]     As noted earlier, the coverage disputes regarding the CCC policies have been settled, and CCC's rights are not implicated in the coverage dispute.

[10]     The Hartford Accident & Indemnity Company and the Insurance Company of North America issued policies that are listed on Exhibit D to the Plan.  These two insurers, in addition to the First State Insurance Company, are also Wellington Signatories.

12

| 6 | First State Insurance Company |
|---|---|
| 7 | Hartford Accident & Indemnity Company |
| 8 | Insurance Company of North America |
| 9 | Seaton Insurance Company |

## E.    The Motions

### 1.    The Motion to Dismiss

#### a.  Coverage Issues

Quigley and Pfizer filed a motion to dismiss the Complaint and the Guildhall Cross-Claim on the basis that the claims are not ripe.  (Consolidated Motion of Quigley Company, Inc. and Pfizer Inc. to Dismiss Plaintiffs' Original Complaint and Defendant Guildhall Insurance Company's Cross-Claim against all Co-Defendants, dated Apr. 21, 2006 ("Quigley Motion to Dismiss") (ECF Doc. # 113).)  With respect to the first three counts, Quigley and Pfizer contend that no present coverage dispute exists because they never demanded any coverage or payment from CIC or LG&A for any asbestos claim under the CIC Policies.  (Id. at ¶ 23.)  Moreover, if the Plan is confirmed, both Pfizer and Quigley will give up the right to seek coverage for asbestos claims under the CIC Policies, and transfer those rights to the Asbestos PI Trust.  The Asbestos PI Trust will determine whether to seek coverage for asbestos-related claims.  In addition, the Plan preserves all of the Plaintiffs' coverage defenses that are the subject of counts one to three.  (Id. at ¶ 24.)

If the Court concludes that the coverage dispute presents a ripe controversy, Pfizer and Quigley next argue that the Court should decline, in the exercise of its discretion, to entertain the dispute.  The Complaint raises complex insurance coverage issues among the more than 40 remaining parties, and the resolution is not necessary to Quigley's bankruptcy case.  In addition,

13

the litigation would needlessly divert Quigley's resources from its nearly completed

reorganization efforts.  (Id. at ¶ 32.)

The Plaintiffs disagree.  They argue that Pfizer and Quigley demanded coverage at the

inception of the bankruptcy case, but in any event, the Plan makes it clear that coverage will be

demanded.  Furthermore, the Court should exercise its jurisdiction.  The issues raised in the

Complaint are straightforward, and any delay will adversely affect their rights under the CIC

Policies.  In addition, a decision interpreting the asbestos exclusion will settle the disputed legal

issues and provide the Plaintiffs with relief from this uncertainty.  Finally, deciding the issues

among the numerous parties raised by the Complaint in one forum will promote judicial

efficiency.

### b.    Anticipatory Repudiation

Quigley and Pfizer also contend that the fourth cause of action, sounding in anticipatory

repudiation, is not ripe.  It requires the Court to prejudge a Plan term outside of the context of a

confirmation hearing.  Although the Plaintiffs maintain that the Pfizer and Quigley Contributions

violate anti-assignment provisions in the policies, the Plan requires a finding that they do not.  If

the Court does not make that finding at the confirmation hearing, the Plan cannot be confirmed

and no assignment will occur.  On the other hand, if the Court makes the finding sought by Pfizer

and Quigley, the transfers of insurance rights will not breach the anti-assignment provisions.  If

the actual assignment is not a breach, the threat of the assignment cannot be an anticipatory

breach.  Either way, the issue should be raised as an objection to confirmation and not as a cause

of action in an adversary proceeding.  Indeed, the Plaintiffs have already raised this very issue in

an objection they filed to Quigley's Plan.  (See id. at ¶¶ 25, 29.)

14

Alternatively, Quigley and Pfizer seek to dismiss Count Four for failure to state a claim pursuant to FED R. CIV. P. 12(b)(6). They contend that the proposed Plan cannot constitute a statement of Quigley's intention not to perform, and furthermore, Pfizer is not even a proponent of the Plan. Moreover, the Quigley Insurance Transfer is merely a transfer of rights under the policies and not an assignment of the policies themselves. If the transfer is not a breach, then the stated intention to transfer is not an anticipatory breach. (See Id. at ¶¶ 35-43.) In addition, Pfizer and Quigley contend that various Bankruptcy Code provisions either expressly or impliedly render the anti-assignment clauses unenforceable. (See Id. at ¶¶ 44-50.)

Once again, the Plaintiffs disagree. They contend that the Plan's proposed transfer goes beyond a mere transfer of the right to collect insurance proceeds, and significantly increases their risks. The Plan, in this regard, improperly affects the Plaintiffs' defenses, fails to identify who will perform the insured's obligations, and deprives the Plaintiffs of their contractual rights to participate in asbestos claims litigation.

### 2.    The Arbitration Motions

The Certain Insurers[11] are Wellington Signatories. They filed a motion to stay the adversary proceeding pending arbitration, (Motion by Certain Insurers to Stay Adversary Proceeding, dated April 21, 2006 (ECF Doc. # 114)), and a companion motion to lift the automatic stay to pursue arbitration. (Motion by Certain Insurers for Relief from the Automatic Stay, dated April 21, 2006 (ECF Doc. # 712, filed in Case no. 04-15739).) They contend that the coverage issues between the Wellington Signatories are subject to mandatory arbitration. In

---

[11]    The Certain Insurers include Travelers Casualty and Surety Company, Employers Insurance Company of Wausau, Royal Indemnity Company, First State Insurance Company, Hartford Accident and Indemnity Company, New England Insurance Company, and Twin City Fire Insurance Company.

addition, they request a discretionary stay as against the defendant insurers who did not sign the

Wellington Agreement.  For similar reasons, Hartford, a subset of the Certain Insurers, [13]

requests dismissal or abstention or a stay with respect to all of Plaintiffs' claims asserted against

Hartford.  (See Notice of Hartford's Motion to Dismiss or, in the Alternative, Abstain or Stay the

Adversary Proceeding, dated April 21, 2006.)(ECF Doc. # 109.)

The Plaintiffs opposed these motions.  As discussed above, they argue that the CIC

Policies are not subject to the Wellington Agreement and its ADR clause, because the CIC

Policies are not listed on Appendix D to the Wellington Agreement.  For the same reason, the

At-Issue Policies issued by the Wellington Signatories are not subject to mandatory arbitration.

## DISCUSSION

**A.    Coverage Issues**

**1.    Introduction**

Counts One, Two and Three of the Complaint seek relief under the Declaratory Judgment

Act of 1934, 28 U.S.C. § 2201,[14] concerning the extent of Quigley's and Pfizer's coverage for

---

[13]     Hartford includes First State Insurance Company, Hartford Accident Indemnity Company, New England Insurance Company, and Twin City Fire Insurance Company.

[14]     28 U.S.C. § 2201(a) provides in pertinent part:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

asbestos-related claims.[15]  The Declaratory Judgment Act "creates a means by which rights and

obligations may be adjudicated in cases involving an actual controversy that has not reached the

stage at which either party may seek a coercive remedy, or in which the party entitled to such a

remedy fails to sue for it."  United States v. Doherty, 786 F.2d 491, 498 (2d Cir. 1986) (Friendly,

J.) (internal quotations omitted).  The purpose of a declaratory judgment is "to afford a speedy

and inexpensive method of adjudicating legal disputes without invoking the coercive remedies of

the old procedure, and to settle legal rights and remove uncertainty and insecurity from legal

relationships without awaiting a violation of the rights or a disturbance of the relationships."

Beacon Constr. Co. v. Matco Elec. Co., 521 F.2d 392, 397 (2d Cir. 1975) (quoting Aetna Cas. &

Surety Co. v. Quarles, 92 F.2d 321, 325 (4th Cir. 1937).)  A party seeking a declaratory judgment

has the burden of proving that the Court has jurisdiction.  E.R. Squibb & Sons, Inc. v. Lloyd's &

Cos., 241 F.3d 154, at 177 (2d Cir. 2001)(citing Cardinal Chem. Co. v. Morton Int'l, Inc., 508

U.S. 83, 95 (1993)).[16]

Even where subject matter jurisdiction exists, the Court may nevertheless decline to hear

a declaratory judgment action in the exercise of its discretion.  See Wilton v. Seven Falls Co.,

515 U.S. 277, 282 (1995); Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 494 (1942);

---

[15]    Plaintiffs assert Counts One and Two against Pfizer and Quigley only.  They assert Count Three against the
other insurer defendants.

[16]    Where, as here, a party moves to dismiss pursuant to FED. R. CIV. P. 12(b)(1) for lack of subject
matter jurisdiction, a court must accept the material factual allegations in the complaint as true, but unlike a motion
made pursuant to Rule 12(b)(6), need not draw inferences favorable to the plaintiff.  J.S. v. Attica Cent. Schools,
386 F.3d 107, 110 (2d Cir. 2004), cert. denied, 544 U.S. 968 (2005); Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d
129, 131 (2d Cir. 1998).  A court may also consider materials outside of the pleadings to resolve any jurisdictional
disputes, but cannot rely on conclusory or hearsay evidence.  J.S., 386 F.3d at 110; Zappia Middle East Constr. Co.
v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000); see 2 JAMES WM. MOORE, MOORE'S FEDERAL
PRACTICE, § 12.30[3], at 12-37 (3d ed. rev. 2006) ("[T]he court need not confine its evaluation to the face of the
pleadings, but may review or accept any evidence, such as affidavits, or it may hold an evidentiary hearing.").

Broadview Chem. Corp. v. Loctite Corp., 417 F.2d 998, 1000 (2d Cir. 1969); Muller v. Olin

Mathieson Chem. Corp., 404 F.2d 501, 505 (2d Cir. 1968).  The Declaratory Judgment Act "is

an enabling Act, which confers a discretion on the courts rather than an absolute right upon the

litigant."  Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 241 (1952).  "Specifically,

the statute provides that in a case of an 'actual controversy' within its jurisdiction, '[a] federal

court may declare the rights and other legal relations of any interested party seeking such

declaration.'"  Dow Jones & Co., Inc. v. Harrods, Ltd., 237 F. Supp.2d 394, 405 (S.D.N.Y.

2002), aff'd, 346 F.3d 357 (2d Cir. 2003) (quoting 28 U.S.C. 2201(a)) (emphasis in original).

Thus, Pfizer's and Quigley's motion to dismiss the coverage claims involves a two-part analysis:

(1) whether the Court has subject matter jurisdiction to hear the declaratory judgment claims, and

if so, (2) whether the Court should exercise that jurisdiction.

## 2.        Subject Matter Jurisdiction

Subject matter jurisdiction under the Declaratory Judgment Act is limited to an "actual

controversy," Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 272 (1941), and is

coextensive with the "case or controversy" standard embodied in Article III of the Constitution.[17]

See Aetna Life Ins. of Hartford v. Haworth, 300 U.S. 227, 239-40 (1937)("The word 'actual' is

one of emphasis rather than of definition."); accord Public Serv. Comm'n of Utah, 344 U.S. at

242; Dow Jones & Co., 237 F. . Supp.2d at 405.  An actual controversy "must be a real and

substantial controversy admitting of specific relief through a decree of conclusive character, as

distinguished from an opinion advising what the law would be upon a hypothetical state of

---

[17]        In addition, the plaintiff must establish an independent basis for federal subject matter jurisdiction.
Warner-Jenkinson Co. v. Allied Chemical Corp., 567 F.2d 184, 186 (2d Cir. 1977).  The coverage issues concern the
extent of Quigley's insurance.  At a minimum, there is "related to" jurisdiction under 28 U.S.C. § 1334(b).

18

facts." <u>Aetna Life Ins. of Hartford</u>, 300 U.S. at 241.  Often, the difference between an abstract

question and an actual controversy is "necessarily one of degree, and it would be difficult, if it

would be possible, to fashion a precise test for determining in every case whether there is such a

controversy." <u>Maryland Cas. Co.</u>, 312 U.S. at 273; <u>Certain Underwriters at Lloyd's, London v.

St. Joe Minerals Corp.</u>, 90 F.3d 671, 675 (2d Cir. 1996).  "Basically, the question in each case is

whether the facts alleged, under all the circumstances, show that there is a substantial

controversy, between parties having adverse legal interests, of sufficient immediacy and reality

to warrant the issuance of a declaratory judgment." <u>Maryland Cas. Co.</u>, 312 U.S. at 273; <u>see

Prudential Lines Inc., v. American S.S. Owners Mut. Prot. & Indem. Assoc.</u>, 158 F.3d 65, 70 (2d

Cir. 1998); <u>Olin Corp. v. Consol. Aluminum Corp.</u>, 5 F.3d 10, 17 (2d Cir. 1993).

Insurance coverage disputes provide a fertile ground where questions of "ripeness"

frequently ripen.  Coverage must often await contingencies, such as whether the insured will

make a claim or whether the claim will reach the level of coverage of an excess policy.  The

existence of an "actual controversy" depends on the "practical likelihood" that the contingency

will occur:

> Like any other action brought in federal court, a declaratory judgment is available
> to resolve a real question of conflicting legal interests.  That the liability may be
> contingent does not necessarily defeat jurisdiction of a declaratory judgment
> action.  Rather, courts should focus on the practical likelihood that the
> contingencies will occur.  Indeed, litigation over insurance coverage has become
> the paradigm for asserting jurisdiction despite future contingencies that will
> determine whether a controversy ever actually becomes real.

<u>Associated Indem. Corp. v. Fairchild Indus., Inc.</u>, 961 F.2d 32, 35 (2d Cir.1992)(internal

citations and quotations omitted); <u>accord</u> <u>E.R. Squibb & Sons</u>, 241 F.3d at 177.

19

Prior to the Plan, the evidence of Pfizer's and Quigley's intentions to demand coverage was equivocal.  They did not schedule the CIC or the At-Issue Policies in Appendix D of the Wellington Agreement, implying their view that the policies did not cover asbestos claims.  In addition, although Pfizer wrote to the Plaintiffs on September 3, 2004, the Petition Date, advising them that it intended to bill the Plaintiffs for any settlements in cases involving "exposure to asbestos, silica or mixed dust" "in accordance with the terms of the policies that provide coverage for such claims,"  (see Opposition to Consolidated Motion of Quigley Company, Inc. and Pfizer Inc. to Dismiss Plaintiff's Original Complaint and Defendant Guildhall Insurance Company's Cross-Claim against all Co-Defendants, dated May 19, 2006 ("Plaintiffs' Opposition"), at ¶ 26)(ECF Doc. # 187)),[18] Pfizer did not name the policies, or make a straightforward claim that they covered asbestos claims, as opposed to silica and mixed dust claims.  Furthermore, the CNA Companies, which include the Plaintiffs, responded on November 21, 2004, that they understood "that Pfizer and Quigley are not currently requesting any of the CNA Service Mark Companies to provide a defense or pay any indemnity amounts." (Ramos Affidavit, Ex. B, at 3.)

The Plan, however, clarified their intentions.  It contemplates that Pfizer and Quigley will contribute their rights to insurance proceeds under the Plaintiffs' policies to the Asbestos PI Trust.  Moreover, the Plan definitions discussed above reflect Pfizer's and Quigley's view that the Plaintiffs' policies cover asbestos-related claims.

---

[18]    The September 3, 2004 letter is attached as Exhibit A to the Affidavit of Gretchen A. Ramos in Support of Continental's Opposition to [Quigley Motion to Dismiss], sworn to May 19, 2006 (the "Ramos Affidavit"), which is itself attached as Attachment 1 to the Plaintiffs' Opposition.

Furthermore, the evidence indicates that Quigley's liability for future asbestos claims will overwhelm its available policy limits. At the inception of the bankruptcy, 160,386 asbestos personal injury claims were pending against Quigley. (Disclosure Statement, § I.D.4 at 19-20.) The expert retained by the Future Demand Holders' Representative estimated that an additional 612,412 claims would be asserted against Quigley. (Id.) In addition, the total value of the current and future claims that have been or will be asserted against Quigley will reach $6.64 billion, or $2.96 billion discounted to present value. (Id.)

At the same time, the universe of insurance purchased by Pfizer for the period of August 25, 1968 to October 1, 1985, which covers personal injury claims, consists of approximately $2.85 billion of primary and excess policy limits, much of which have been exhausted or released. (Id. § IV.A.5(b) at 32.) As of the Petition Date, Pfizer and Quigley held just $889.8 million in unbilled, solvent policy limits available to cover personal injury claims. (Id.) Given the high level of claims and the resulting shortfall, there is a "practical likelihood" that coverage will be sought for asbestos-related claims under the CIC Policies. See E.R. Squibb, 241 F.3d at 177-78. In fact, Quigley conceded at oral argument that the trustee of the Asbestos PI Trust would make the demand. (Tr. at 74.) Accordingly, an "actual controversy" exists regarding the coverage under the CIC Policies. For the same reason, an "actual controversy" exists with respect to the Guildhall policies that appear on Exhibit C to the Plan.

### 3.    Discretion under the Declaratory Judgment Act

As noted, even where the court has subject matter jurisdiction, it enjoys substantial discretion not to exercise it. See Wilton, 515 U.S. at 286-88; Public Service Comm'n of Utah,

344 U.S. at 241; Brillhart, 316 U.S. at 494-95.  In Wilton, the Supreme Court contrasted this

discretion with the more limited discretion to decline jurisdiction in other settings:

> Since its inception, the Declaratory Judgment Act has been understood to confer
> on federal courts unique and substantial discretion in deciding whether to declare
> the rights of litigants. On its face, the statute provides that a court may declare the
> rights and other legal relations of any interested party seeking such declaration.
> The statute's textual commitment to discretion, and the breadth of leeway we have
> always understood it to suggest, distinguish the declaratory judgment context
> from other areas of the law in which concepts of discretion surface.  We have
> repeatedly characterized the Declaratory Judgment Act as an enabling Act, which
> confers a discretion on the courts rather than an absolute right upon the litigant . .
> . .  Consistent with the nonobligatory nature of the remedy, a district court is
> authorized, in the sound exercise of its discretion, to stay or to dismiss an action
> seeking a declaratory judgment before trial or after all arguments have drawn to a
> close.  In the declaratory judgment context, the normal principle that federal
> courts should adjudicate claims within their jurisdiction yields to considerations
> of practicality and wise judicial administration.

515 U.S. at 286-88 (internal citations and quotations omitted).

The exercise of that court's discretion is informed by two principles: (1) whether "the

judgment will serve a useful purpose in clarifying and settling the legal relations in issue," and

(2) whether "it will terminate and afford relief from the uncertainty, insecurity, and controversy

giving rise to the proceeding."  Broadview Chem. Corp., 417 F.2d at 1000-01 (citing EDWIN M.

BORCHARD, DECLARATORY JUDGMENTS 299 (2d ed. 1941)).  Indeed, at least one Second Circuit

case has stated that "[i]f either prong is met, the action must be entertained." Cont'l Cas. Co. v.

Coastal Savs. Bank, 977 F.2d 734, 737 (2d Cir. 1992)(emphasis added).  In Dow Jones & Co.,

the District Court expanded the Broadview criteria, and considered factors adopted by other

circuit courts, including:

> (1) whether the declaratory action would settle the controversy; (2) whether the
> declaratory action would serve a useful purpose in clarifying the legal relations in
> issue; (3) whether the declaratory remedy is being used merely for the purpose of
> procedural fencing or to provide an arena for a race for res judicata; (4) whether
> the use of a declaratory action would increase friction between our federal and

state courts and improperly encroach upon state jurisdiction; and (5) whether
there is an alternative remedy which is better or more effective.

237 F. Supp. 2d at 432 (internal citations and quotations omitted).

Although these factors do not line up uniformly on one side or the other, they weigh in
favor of exercising jurisdiction in this case.  First, resolution of the coverage dispute will
certainly "serve a useful purpose in clarifying the legal relations in issue," and afford relief from
uncertainty.  Even if a formal demand has not been made, the coverage issue is simmering below
the surface.  Quigley's and Pfizer's protestations to the contrary notwithstanding, they view the
CIC Policies as important assets that they are contributing to the Asbestos PI Trust under the
Plan.  (See Disclosure Statement § IV.A.5 at 31-38.)  Moreover, the coverage dispute will take
time to resolve.  If the Plan is confirmed, the Asbestos PI Trust will be called upon to make
distributions.  The availability of the insurance is plainly important in determining the amount
that can be distributed to claimants.  Although this Court's current exercise of its jurisdiction is
essentially limited to the conclusion that an arbitrator must resolve the coverage dispute, at least
as between the Wellington Signatories, the resolution of the arbitration issue will clarify this
contentious point and move the dispute toward resolution.

Second, this action will not interfere with proceedings in any other court or provide the
Plaintiffs with a procedural advantage.  This concern often arises when the parties are already
involved in or contemplate litigation for "coercive" relief, and one of the parties commences a
preemptive declaratory judgment action to wrest control over the decision-making process from
the plaintiff's forum of choice.  See Nucor Corp. v. Aceros Y Maquilas de Occidente, S.A., 28
F.3d 572, 577 (7th Cir. 1994)("A suit for a declaratory judgment aimed solely at wresting the
choice of forum from the natural plaintiff will normally be dismissed and the case allowed to

proceed in the usual way.")(internal quotations omitted); <u>CGI Solutions LLC v. Sailtime Licensing Group, LLC</u>, No. 05 Civ. 4120(DAB), 2005 WL 3097533, at *7 (S.D.N.Y. Nov. 17, 2005) (dismissing preemptive declaratory judgment action in favor of Texas action for coercive relief filed by defendant); <u>Great Am. Ins. Co. v. Houston Gen. Ins. Co.</u>, 735 F. Supp. 581, 585-86 (S.D.N.Y. 1990) (dismissing declaratory judgment action on discretionary grounds where plaintiff commenced action in anticipation of litigation in another jurisdiction, intending to preempt the forum choice of defendant).  Here, there are no other actual or contemplated proceedings designed to obtain coercive relief.

It is true that abstaining from exercising jurisdiction will not cause prejudice to any party.  One of the primary purposes of the Declaratory Judgment Act is "to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage had accrued." <u>Luckenbach S.S. Co. v. United States</u>, 312 F.2d 545 at 548 (2d Cir. 1963) (internal citation and quotation omitted); <u>accord</u> <u>CGI Solutions</u>, 2005 WL 3097533 at *7.  Here, delay will not increase the Plaintiffs' damages, their risk, or their liability under the CIC Policies.  On balance, however, I conclude that the Court should exercise jurisdiction to decide the coverage disputes involving CIC, Quigley, Pfizer and Guildhall, subject, however, to the discussion of arbitration in the next section of this opinion.

**B.    Arbitration**

Several of the defendant insurers have filed or joined in one of three motions.  These include a the <u>Motion by Certain Insurers to Stay Adversary Proceeding</u>, dated April 21, 2006 (ECF Doc. # 114), the <u>Motion by Certain Insurers for Relief from the Automatic Stay</u>, dated

April 21, 2006 (ECF Doc. # 712, filed in Case no. 04-15739), and <u>Hartford's Motion to Dismiss</u>

<u>or, in the Alternative, Abstain or Stay the Adversary Proceeding</u>, dated April 21, 2006 (ECF

Doc. # 110).  The three motions share a common thread, to wit, that the resolution of the

coverage dispute between Wellington Signatories is subject to mandatory arbitration under the

Wellington Agreement.

1.        **The Application to Stay the Adversary Proceeding**

It is undisputed that the parties' arbitration agreement is subject to the provisions of the

Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 <u>et seq</u>.  The FAA requires a federal court to

enforce the parties' arbitration agreement,[19] and stay litigation that contravenes it.[20]  In deciding

whether a dispute is arbitrable, the court must answer two questions:  (1) did the parties agree to

arbitrate, and if so, (2) does their agreement to arbitrate cover the particular dispute?  <u>Bank Julius</u>

<u>Baer & Co. v. Waxfield Ltd.</u>, 424 F.3d 278, 281 (2d Cir. 2005); <u>ACE Capital re Overseas Ltd. v.</u>

<u>Cent. United Life Ins. Co.</u>, 307 F.3d 24, 28 (2d Cir. 2002); <u>United States Fire Ins. Co. v. National</u>

<u>Gypsum Co.</u>, 101 F.3d 813, 816 (2d Cir. 1996), <u>cert. denied</u>, 521 U.S. 1120 (1997).  The

---

[19]        Section 2 of the FAA provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising our of such a contract, transaction, or refusal shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

[20]        Section 3 of the FAA states:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

determination of arbitrability is governed by federal substantive law, <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,</u> 473 U.S. 614, 626 (1985); <u>Moses H. Cone Memorial Hosp. v. Mercury Const. Corp</u>**,** 460 U.S. 1, 24 (1983), but in the end, general principles of contract law control. <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944 (1995)("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts."); <u>AT & T Techs., Inc. v. Comm'ns Workers</u>, 475 U.S. 643, 648 (1986)("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit")(internal citation and quotation marks omitted); <u>see</u> <u>Mitsubishi Motors Corp.,</u> 473 U.S. at 626 ("[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute.")

> The answer to the second question is informed by the policy that favors arbitration:
>
> [Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. . . . The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

<u>Moses H. Cone Memorial Hosp.</u>, 460 U.S. at 24-25; <u>accord</u> <u>Mitsubishi Motors Corp.,</u> 473 U.S. at 626; <u>Bank Julius Baer & Co.,</u> 424 F.3d at 281. "Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." <u>Mitsubishi Motors Corp.,</u> 473 U.S. at 626; <u>accord</u> <u>AT & T Techs., Inc.,</u> 475 U.S. at 650 ("[T]here is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is

26

not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'")(quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-583 (1960)).

The Court has already discussed the arbitration provisions of the Wellington Agreement. They are broad, United States Fire Ins. Co., 101 F.3d at 815, and unambiguously encompass coverage issues and coverage defenses. Given the arbitration clause's breadth, arbitrability will be presumed "if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'" Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001)(quoting Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 23 (2d Cir.1995)). The only question concerns CIC's argument that the arbitration agreement is limited to the scheduled policies.

Although the answer is not entirely free from doubt, the arbitration clause does not expressly exclude unlisted policies from its scope. Indeed, the Wellington Agreement does not identify any issues that were specifically excluded from arbitration, and the parties have not pointed to any. Furthermore, the reference in the arbitration clause to "Appendices" appears to expand rather than limit jurisdiction. Thus, arbitration is not restricted to disputes under the body of the Wellington Agreement, but extends to disputes under the Appendices as well. Finally, CIC's position raises defenses in the nature of waiver and estoppel, and whether the failure to schedule a policy precludes the later assertion that it covers asbestos-related claims. These defenses are subject to arbitration. See Porter Hayden Co. v. Century Indemnity Co., 136 F.3d 380, 382-84 (4th Cir. 1998)(defenses of statute of limitations and laches are arbitrable under the Wellington Agreement).

27

For the reasons discussed, the presumption in favor of arbitrability under federal substantive arbitration law requires the Court to resolve any doubts in favor of arbitration of the disputed coverage issue.  See Porter Hayden Co., 136 F.3d at 382 (the heavy federal presumption of arbitrability "dictates that any ambiguity in the scope of the Wellington Agreement's arbitration clause be resolved in favor of arbitration").  Although CIC directed Count One at Quigley and Pfizer only, the coverage issues raised in Count One implicate the rights of most of the Certain Insurers as well as the other defendant insurers that issued At-Issue Policies; the determination of CIC's coverage will affect the allocation sought under Count Three.  In fact, all coverage disputes must be resolved before liability can be allocated among the defendant insurers.[21]  Furthermore, no party has argued that the Certain Insurers lack standing to seek a stay of the coverage dispute litigation between CIC, Pfizer and Quigley, who are also Wellington Signatories.  Accordingly, Count One will be stayed under the mandate of FAA § 3 with respect to the coverage disputes involving the Certain Insurers, CIC, Pfizer and Quigley.

2.      **The Hartford Motion**

Hartford moved, in the alternative, for dismissal, abstention or a stay.  There is a substantial question as to whether a court may dismiss a complaint, even when all of the claims are subject to mandatory arbitration.  See Lloyd v. Hovensa, LLC, 369 F.3d 263, 268-69 (3d Cir. 2004) (collecting cases).  Furthermore, Hartford is not even named as a defendant in Counts One and Two.

---

[21]      The coverage disputes do not appear to involve Harford Accident & Indemnity Company or the First State Insurance Company, two of the Certain Insurers whose policies are not listed on Exhibit C to the Plan. Nevertheless, they are entitled to arbitration to the extent that a dispute regarding coverage exists.

28

It is unnecessary to consider these questions, or the branch of the motion seeking abstention.  Hartford is a subset of the Certain Insurers, and for the reasons discussed, the Court will grant its alternative motion and stay Count One.

### 3.    The Non-Signatories

The 25 defendant insurers that comprise Group 2 issued At-Issue Policies but did not sign the Wellington Agreement.   (See Recap Declaration, Attachment. B.)  In addition, six of the nine insurers in Group 3 did not sign the Wellington Agreement.[22]  They are not bound by the Wellington Agreement's arbitration clause, and are not subject to the mandatory stay under FAA § 3.  The Court will nevertheless stay any coverage disputes involving these parties in the exercise of its discretion.[23]

Courts have the inherent power to grant a discretionary stay of a proceeding pending arbitration, Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S, 943 F.2d 220, 225 (2d Cir. 1991), where there are issues common to the arbitration and the court proceeding, and those issues may be determined by the arbitration.  Sierra Rutile Ltd. v. Katz, 937 F.2d 743, 750 (2d Cir. 1991); Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc., 885 F. Supp. 499, 502 (S.D.N.Y. 1995); Kittay v. Landegger, et al. (In re Hagerstown Fiber Ltd. P'ship), 277 B.R. 181, 199 (Bankr. S.D.N.Y. 2002) (a stay is appropriate when the non-arbitrable and arbitrable claims involve common questions of law and fact or when the arbitration is likely to dispose of issues common to the claims of the arbitrating and non-arbitrating defendants.).  Broad stay orders are particularly appropriate where the arbitrable claims predominate the lawsuit, the stay will

---

[22]    The three that did sign the Wellington Agreement are identified in footnote 10, supra.

[23]    The Group 3 insurers may not have to face any coverage disputes because their policies are not listed on Exhibit C.  The Court will nonetheless extend the stay to these defendants to the extent any coverage disputes exist.

29

promote judicial economy, and the delay will not cause undue hardship to the non-moving

parties.  Id.

Here, the coverage dispute involving the Wellington Signatories and the non-signatories

is the same.  It is likely that the arbitration will dispose of this predominant issue, and may,

therefore, promote a resolution involving all of the parties.  Lastly, the stay will avoid a race to

the finish, and the possibility that this Court would usurp the arbitrator or his jurisdiction by

deciding the coverage issue before he does.

The foregoing still leaves three defendant insurers that have not been accounted for.  The

International Insurance Company and the Westchester Fire Insurance Company are part of Group

1.  They signed the Wellington Agreement and issued At-Issue Policies.  The Insurance

Company of North America, a member of Group 3, signed the Wellington Agreement although it

did not issue a policy listed on Exhibit C to the Plan.  If their failure to seek a stay implies a

willingness to litigate coverage issues in this Court, they may be in the same legal position as the

non-Wellington Signatories who cannot be compelled to arbitrate.  The Court will stay any

coverage disputes involving these parties in the exercise of its discretion for the same reason that

it granted a discretionary stay with respect to the non-Wellington Signatories.

### 4.        The Motion for Relief From the Automatic Stay

Up to this point, the Court has stayed the continued litigation of Count One in favor of

arbitration, but has not compelled any further proceedings.  The Certain Insurers have filed a

companion motion in the main bankruptcy case for relief from the automatic stay to proceed with

arbitration of the coverage dispute.  Section 362(d)(1) of the Bankruptcy Code permits relief

from the stay, on motion of a party in interest and after notice and a hearing, "for cause,

including the lack of adequate protection of an interest in property of such party in interest."  The

movant has the initial burden to show "cause" for relief from the stay.  E.g., Mazzeo v. Lenhart

(In re Mazzeo), 167 F.3d 139, 142 (2d Cir. 1999).  The statute does not define "cause," and we

are guided by the following factors enunciated by the Second Circuit in Sonnax Indus. Inc. v.

TRI Component Prods. Corp. (In re Sonnax Indus., Inc.), 907 F.2d 1280 (2d Cir. 1990):

> (1) whether relief would result in a partial or complete resolution of the issues;
> (2) lack of any connection with or interference with the bankruptcy case; (3)
> whether the other proceeding involves the debtor as a fiduciary; (4) whether a
> specialized tribunal with the necessary expertise has been established to hear the
> cause of action; (5) whether the debtor's insurer has assumed full responsibility
> for defending it; (6) whether the action primarily involves third parties; (7)
> whether litigation in another forum would prejudice the interests of other
> creditors;  (8) whether the judgment claim arising from the other action is subject
> to equitable subordination; (9) whether movant's success in the other proceeding
> would result in a judicial lien avoidable by the debtor; (10) the interests of judicial
> economy and the expeditious and economical resolution of litigation; (11)
> whether the parties are ready for trial in the other proceeding; and (12) impact of
> the stay on the parties and the balance of harms.

Id. at 1286.  Not all of the factors are relevant in every case, Mazzeo, 167 F.3d at 143, and the

Court need not assign equal weight to each factor.  Keene Corp., 171 B.R. 180, 183 (S.D.N.Y.

1994).

Given the conclusion regarding arbitration, the Sonnax question comes down to one of

timing.  This Court cannot hear the portion of the coverage dispute subject to mandatory

arbitration; the arbitrator will have to resolve that issue.  Thus, the only question is whether the

Court should allow the Certain Insurers to proceed with arbitration now.

The answer is yes, because arbitration now is more likely to lead to complete resolution

in one forum.  The Certain Insurers represented that they intend to include, in a single arbitration,

Pfizer, Quigley, and all of the Wellington Signatories that issued At-Issue Policies.  (Response

31

by Certain Insurers to Consolidated Opposition of Quigley Company, Inc. and Pfizer Inc. to

Motion by Certain Insurers for Relief from the Automatic Stay, dated May 31, 2006, at 5-6)(ECF

Doc. # 842, filed in Case no. 04-15739.)  These insurers, which presumably include CIC as well,

account for the vast majority of the liability limits implicated by the Transit Policies' exclusion.

(See Motion by Certain Insurers for Relief from the Automatic Stay at 8-9.)  While there is no

reason to believe that the Certain Insurers will change their position in the future, the Court can

enforce their promise now by making it a condition of granting their motion.  If the arbitrations

proliferate, the Court can reconsider the matter, and if necessary, reimpose the stay.  In addition,

when discussing the discretionary stay, I suggested that a resolution of the coverage issue

through arbitration might prompt a resolution of the entire coverage dispute.  At a minimum, it

will resolve most of the dollars in dispute.  Accordingly, stay relief will have a greater chance of

encouraging a complete resolution of the issues, (Sonnax Factor # 1), and will promote "the

interests of judicial economy and the expeditious and economical resolution of litigation."

(Sonnax Factor # 10.)

Other Sonnax factors also weigh in favor of stay relief.  The arbitration will not interfere

with the bankruptcy case; Quigley insists that it can confirm the Plan without first resolving the

insurance coverage issue.  (Sonnax Factor # 2.)  The proposed arbitration "primarily" involves

third parties.  (Sonnax Factor # 6.)  Finally, the case law indicates that there have been numerous

arbitrations under the Wellington Agreement.  Although there is no guaranty, I suspect that the

arbitrators that the parties select will have Wellington experience, and specialized knowledge of

the intricacies of this comprehensive and complex agreement.  (Sonnax Factor # 4.)

Quigley's and Pfizer's opposition focuses on concerns that arbitration, at this time, will significantly interfere with the administration of the estate and that the balancing of the harms militates in favor of continuing the automatic stay.  The former, which centers on the fear of multiple arbitrations, (see Consolidated Opposition of Quigley Company, Inc. and Pfizer Inc. to Motion By Certain Insurers For Relief From the Automatic Stay, dated May 19, 2006, at 11)(ECF Doc. # 797, filed in Case no. 04-15739), has been addressed.  Quigley and Pfizer imply that they will insist on separate arbitrations with each insurer.  (Id. at 10)("Although the Wellington Agreement does not preclude multi-party arbitrations, Quigley and Pfizer each has the right to a separate arbitration proceeding with each co-defendant insurer that is a Wellington signatory.")  If they do, they cannot complain about multiple arbitrations.

They also contend that they have entered into settlement agreements with several non-Wellington Signatories, and those settlements contain their own arbitration clauses.  Pfizer and Quigley fear that stay relief will trigger arbitrations with the settling parties.  (Id. at 11.)  That issue is not, however, currently before me, and the proposal on the table will resolve most of the disputes in dollar terms.  Furthermore, Quigley and Pfizer did not identify who those other parties are, or the arbitration clauses to which they referred.  In any event, those arbitration clauses presumably apply to the particular settlement agreement, and raise different issues.

As to the balancing of the harms, Pfizer and Quigley maintain that, on the one hand, the Certain Insurers will not be harmed by a continuation of the stay, the arbitrable claims are "unripe," and they have no connection with the confirmation process, and perhaps, the chapter 11 case.  (Id. at 13.)  On the other hand, stay relief will "produce significant and needless costs," and divert Quigley's limited resources from the confirmation process.  (Id.)

33

Initially, the claims involving the Group 1 insurers are "ripe" for the reasons stated earlier in this decision, and the lack of any connection with the confirmation process or the case is an argument for, rather than against, stay relief.  If Quigley and Pfizer are right, the coverage dispute can move at its own pace without disturbing the administration of the case.  Furthermore, while the prejudice to the Certain Insurers is minimal if the stay is continued, Quigley has not articulated how it will suffer significant prejudice if the stay is modified to permit a single arbitration.  The coverage dispute appears to present a straightforward legal issue.  In any event, any coverage disputes among the Wellington Signatories must be resolved through arbitration, and the same dollars, must, therefore, be spent either by Pfizer and Quigley or the Asbestos PI Trust to resolve it.

On balance, the Court concludes that stay should be modified to the extent of allowing the Certain Insurers to file a single arbitration that joins all of the Wellington Signatories that issued At-Issue Policies.

## C.    Counts Two and Three

The Court will also stay the litigation of Count Two, but for a different reason.  Count Two seeks reformation, and is contingent on a determination that the policies do not exclude asbestos coverage.  Hence, consideration of this issue is premature.  It is far from clear that reformation of the insurance policies is arbitrable, but that issue can be addressed, if need be, at a later date.

As stated earlier, Count Three is also contingent on a determination that the policies require coverage.  This claim is also premature.  I note, however, that the Wellington Agreement

34

contains allocation provisions, and this issue may ultimately be subject to mandatory arbitration among the Wellington Signatories.

## D.    Count Four – Anticipatory Repudiation

Pfizer and Quigley moved to dismiss Count Four, which alleges a claim unrelated to coverage dispute.  The Plaintiffs contend that the Plan provision that transfers Quigley's and Pfizer's interests in its insurance policies to the Asbestos PI Trust without the Plaintiffs' consent breaches the anti-assignment clauses in the Plaintiffs' policies and otherwise impairs the Plaintiffs' rights.  Pfizer and Quigley maintain that the claim is not "ripe," but if it is, Count Four fails to state a claim on which relief can be granted.  FED. R. CIV. P. 12(b)(6).  Since Count Four depends on the terms of the Plan, the Court may consider the Plan as well as the allegations in the Complaint in judging its legal sufficiency.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

Count Four is based on the doctrine of anticipatory repudiation.  An anticipatory repudiation occurs when a party to a contract (1) states that he cannot or will not perform his obligations, or (2) commits a voluntary affirmative act that renders the obligor unable or apparently unable to perform his obligations.  Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 705 N.E.2d 656, 659 (N.Y. 1998) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 250 (1981)); see Lucente v. Int'l Bus. Mach. Corp., 310 F.3d 243, 258 (2d Cir. 2002); De Lorenzo v. BAC Agency, Inc., 681 N.Y.S.2d 846, 848 (N.Y. App. Div. 1998); JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS  12-4, at 525 (3rd ed. 1987); RESTATEMENT (SECOND) OF CONTRACTS § 250 cmt. b (1981).  "For a statement to constitute an anticipatory breach, the announcement of an intention not to perform [must be] positive and

35

unequivocal." Argonaut P'ship, L.P. v. Sidek, S.A. de C.V., No. 96 Civ. 1967 (MBM), 1996 WL

617335, at *5 (S.D.N.Y. Oct. 25, 1996)(quoting Tenavision, Inc. v. Neuman, 379 N.E.2d 1166,

1168 (N.Y. 1978)), aff'd on grounds stated in district court op., 141 F.3d 1151 (2d Cir. 1998).

Whether the proposed insurance transfer constitutes an anticipatory breach of the insurance

contracts is ripe for determination, and the issue is whether Count Four states a legally sufficient

claim.

The Court faced a similar issue in In re Asia Global Crossing, Ltd., 326 B.R. 240 (Bankr.

S.D.N.Y. 2005). There, the debtor guaranteed the performance of a contract under which an

affiliate agreed to deliver telecommunications capacity to 360networks. The performance of the

contract required the use of the debtor's property. The debtor subsequently commenced a

chapter 11 case, and filed a motion to sell substantially all its assets. 360networks filed a proof

of claim, and contended that the proposed sale constituted an anticipatory breach of the contract

because it rendered the debtor unable to perform.

The principal issue was whether the filing of a motion, which had not yet been approved

by the Court, positively and unequivocally rendered the debtor unable to perform. Rejecting the

creditor's argument, the Court ruled:

> Asia Global's motion to sell all of its assets, without more, did not prevent it from
> living up to the performance guaranty. The proposed transaction fell outside of
> Asia Global's ordinary course of business, and required Court approval. See 11
> U.S.C. § 363(b)(1). Asia Global was not, therefore, bound to perform the ANC
> Sale contract until Court approval. Prior to approval, Asia Global could withdraw
> the application and abandon the contract, or the terms of the sale contract could
> change. The proposed sale contract might have given 360networks pause and
> entitled it to demand adequate assurance of future performance, but it did not
> legally prevent Asia Global from meeting its obligations.

Id. at 256.

36

Here, we are concerned with a statement of intention rather than the ability to perform, but the same rule applies. Quigley and Pfizer will not transfer their insurance interests unless the Plan is confirmed. The proposal can still be modified or withdrawn, or the Plan may never be confirmed.

Furthermore, the Plan requires a finding or conclusion in the Confirmation Order that the insurance assignments "do not violate any consent-to-assignment provisions of any applicable insurance policy, agreement, or contract;"(Plan § 12.1(e)(xvi) at 189), and that the assignment of the insurance interests "pursuant to the Plan is valid, effective and enforceable." (Id. § 12.1(e)(xvii) at 190.) Thus, the precise issue raised by the Plaintiffs in Count Four must be resolved in connection with the confirmation of the Plan. Even if Quigley waives the required finding or conclusion, (see id. § 12.3 at 191), the Plaintiffs can still object to confirmation on the same basis. In fact, they have already done so. (See Objection of Continental Casualty Company and Continental Insurance Company to Confirmation of Quigley Company, Inc. Third Amended Plan, dated Apr. 13, 2006, at 16-21, 28-30)(ECF Doc. # 698, filed in Case no. 04-15739.)

Accordingly, the proposed Plan provision, without more, does not constitute an anticipatory breach, and Count Four does not state a legally sufficient claim. Furthermore, the same question is teed up as part of the confirmation process, and the Court can deal with it at that time as a core matter. Nothing in this opinion is intended to prejudice the right of any party in interest to raise these objections at that time.

## CONCLUSION

Quigley's and Pfizer's motion to dismiss the Complaint and Guildhall's cross-claim for lack of subject matter jurisdiction is denied.  The litigation of Counts One, Two and Three, and Guildhall's cross-claim, are stayed pending the arbitration of the coverage disputes alleged in Count One of the Complaint and incorporated into Guildhall's cross-claim.  The Certain Insurers motion for relief from the stay is granted to the extent discussed above.  Hartford's motion to dismiss or abstain is denied, but its alternative motion for a stay is granted.  Finally, Count Four is dismissed without prejudice to the assertion of the same arguments as a confirmation objection.

Dated: New York, New York
       February 22, 2007

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                   Chief United States Bankruptcy Judge